UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:18 CR 332 RLW ) |
| WILLIAM PETER ANDERSON, a/k/a "Kill Bill", | ) ) ) ) |
| Defendant. | |

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

**1. PARTIES:**

The parties are the defendant WILLIAM PETER ANDERSON, represented by defense counsel MELISSA GOYMERAC, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

**2. GUILTY PLEA:**

Pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Distribution of a Controlled Substance, a lesser offense necessarily included in Count III of the Second Superseding Indictment, the government agrees to move for the dismissal as to the defendant of Counts I, II, and IV at the time of sentencing.

1

Moreover, the United States agrees that no further federal prosecution will be brought in this District relative to the defendant's possession or distribution of Fentanyl on April 10 and/or April 17, 2018, or as to his participation in a conspiracy to distribute fentanyl between February 2018 and the date of entry of this plea (to include any charges relating to the death of C.P.).

Defendant acknowledges that this disposition confers upon him the benefit of eliminating the 20-year mandatory minimum sentence that would be required if he were to be convicted of Count I of the Indictment. The parties agree that the controlled substance distributed by defendant to C.P. was the "but for" cause C.P.'s death. As a result, the plea agreement establishes a more serious offense than the "offense of conviction." Section 1B1.2(c) provides, "[a] plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those [sic] offense(s)." Pursuant to Section 1B1.2, the parties agree that the Court should apply the guidelines applicable to the more serious offense as established herein and admitted under oath by defendant. The parties recognize that the maximum possible penalty remains 20 years pursuant to Title 21, United States Code, Section 841(b)(1)(C) and Section 1B1.2, Application Note 1.

**Pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, the parties agree that the defendant's sentence should be 144 months. This agreement shall abide, notwithstanding the application or non-application of any particular Sentencing Guidelines, including any Guidelines contemplated by this agreement. If the Court informs the parties prior to sentencing that it will reject this agreement or that it intends to sentence defendant to a sentence not in conformity with this agreement, then either party**

**may withdraw from the plea agreement and the defendant will have an opportunity to withdraw his guilty plea pursuant to Rule 11(c)(5).**

## 3. ELEMENTS:

As to the lesser offense necessarily included in Count III, the defendant admits to knowingly violating Title 21, United States Code, Section 841(a)(1), and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

1. That on or about April 5, 2018 within the Eastern District of Missouri, the defendant distributed Fentanyl, a Schedule II controlled substance, and;

2. That he did so knowingly and intentionally,

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

At approximately 1:13 a.m. on April 4, 2018, the St. Louis County Police and emergency medical personnel responded to an apartment in the 300 block of Point Return Drive in St. Louis County, Missouri on a report of an unresponsive male. Upon arrival, responders located C.P., who had been discovered outside the apartment unconscious and not breathing. According to C.P.'s roommate, S.R., he had returned home at approximately 1:10 a.m. and discovered C.P. S.R. summoned another subject, Gary Scott Hancock (Hancock), from inside the apartment.[1] S.R. and Hancock moved C.P. into the apartment and attempted to render aid, while also calling 911.

---

[1] Although Hancock's legal first name is "Gary," he goes by his middle name, "Scott."

3

Despite the efforts of emergency medical personnel, C.P. was pronounced deceased. The Office of the Medical Examiner for St. Louis County conducted a post-mortem examination upon C.P. and concluded that he died as a result of "Acute Fentanyl and Heroin Intoxication."

St. Louis County Police interviewed Hancock. Hancock reported that he had been staying at the apartment for a few days and had known C.P. for several years. Hancock stated that on April 5, 2018, he had acquired a controlled substance from a man who identified himself as "Kill Bill." According to Hancock, he and C.P. believed the substance to be cocaine, but after ingesting it, they believed it to be "heroin or fentanyl." Hancock informed investigators that the controlled substance caused him to lose consciousness for a time.

Hancock described the April 5, 2018 transaction in which he had purchased the drugs from "Kill Bill." He stated that he went, alone, to see "Kill Bill" and that "Kill Bill" had provided him the drugs for free. According to Hancock he had met "Kill Bill" at a BP gas station near Lucas and Hunt approximately four or five days earlier. "Kill Bill" approached him and asked him if he used cocaine. Hancock admitted that he did, and "Kill Bill" instructed Hancock to follow him. Hancock followed "Kill Bill" to a second location, where he provided Hancock with drugs in a small plastic bag. Hancock reported that "Kill Bill" was driving a dark blue or grey Mercedes Benz sport-utility vehicle at the time. Hancock advised investigators that on April 5, 2018, he obtained drugs from "Kill Bill" again after "Kill Bill" called him and asked him to try some new "stuff" he had. "Kill Bill" gave him the drugs for free, packaged in a bag with "white drugs." According to Hancock, "Kill Bill" said he did not know what kind of drugs were in the bag, but believed it was cocaine. Hancock stated that after he acquired the drugs

4

from "Kill Bill," he returned to the apartment where he and C.P. "snorted" the drugs. Hancock provided investigators with the telephone number that he used to contact "Kill Bill."

After Hancock recovered from the adverse side effects of the drugs on April 6, 2018 where the remainder of the drugs from "Kill Bill" were located. He wanted C.P. to throw them away. C.P. denied that he still had the drugs. Hancock told investigators that the last time he saw the drugs, they were in C.P.'s room on his dresser. During a search of C.P.'s room, investigators located a small plastic bag, knotted at the top, in C.P.'s dresser drawer. Investigators removed the bag and showed it to Hancock. Hancock identified the bag as the drugs he had acquired from "Kill Bill." The substance retrieved from C.P.'s dresser were subsequently transported to the St. Louis County Police Department Crime Laboratory for purposes of laboratory testing. The substance was confirmed to be fentanyl.

The St. Louis County Police Department subsequently identified "Kill Bill" as defendant William Peter ANDERSON ("ANDERSON").

On April 10, 2018, the Federal Bureau of Investigations utilized an Undercover Officer (hereinafter "UC") to purchase a quantity of a controlled substance believed and represented to be Fentanyl from William Peter ANDERSON ("ANDERSON"). At approximately 2:15 PM, UC contacted ANDERSON on his cellular phone (using the telephone number provided by Hancock) and asked if he could purchase $60.00 (sixty dollars) worth. ANDERSON told UC that he was "good" and directed UC to a specific location. UC was instructed to call ANDERSON when he arrived at the location.

Prior to responding to the designated location, UC was outfitted with a body wire, "kel" transmitter, which would allow members of the Anti-Gang Unit to audibly monitor the illegal

narcotics transaction. UC was provided with $60.00 of U.S. currency from the St. Louis County buy fund to be used in the purchase of the narcotics. This money was photocopied for later identification purposes. Surveillance was also established in the vicinity of the designated location.

Once at the predetermined location, UC conducted a recorded call with ANDERSON, who advised him to respond to the BP gas station at Kingshighway Blvd. and Natural Bridge Ave. and wait. ANDERSON then called UC and directed him to an alley located between N. Taylor Ave. and Camellia Ave off of Kossuth Ave. A short time later, surveillance observed ANDERSON exit the front door of his residence. ANDERSON was wearing a maroon jacket with a white t-shirt underneath and gray sweatpants. ANDERSON walked off the front porch and around the south side of the residence to the backyard.

UC observed ANDERSON emerge in the alleyway and walk to UC's vehicle. UC handed ANDERSON $60.00 (sixty dollars) of department buy funds (which was previously photocopied). After receiving the buy money, ANDERSON handed UC a plastic bag containing a white powder substance believed to be Fentanyl. UC asked ANDERSON "is this the same shit as the other day," to which ANDERSON responded "Yes." Once the transaction was complete, UC observed ANDERSON enter a rear yard off the alleyway as he drove away to return to the staging location.

Following the transaction, surveillance officers observed ANDERSON return to his residence. UC responded to the secure location while under constant surveillance. Once at the secure location UC properly marked and packaged the plastic bag containing the white powder

substance. Subsequent laboratory tests confirmed that the substance that ANDERSON sold to UC was fentanyl.

On or about April 16, 2018, United States Magistrate Judge Noelle C. Collins authorized a search warrant for ANDERSON'S residence in the 4100 block of Camellia in St. Louis, Missouri. In anticipation of the execution of that search warrant, the investigative team utilized UC to make another controlled purchase from ANDERSON. Prior to the transaction, UC contacted ANDERSON by telephone. ANDERSON directed UC to a specific location and advised UC to call when he was "close." UC did as he was instructed. During the second call, ANDERSON directed UC to a location in the Walnut Park neighborhood. UC arrived at that location, where he/she met with ANDERSON, who was accompanied by a then-unknown male. ANDERSON exited his vehicle and approached UC's vehicle. ANDERSON handed UC a small piece of plastic containing a substance believed to be Fentanyl. (UC had advised ANDERSON that he was seeking to purchase the same substance that he/she had purchased previously). UC provided ANDERSON with $60 in purchase funds provided by St. Louis County Police for purposes of the transaction. The money had been photocopied in advance to memorialize the serial numbers of the bills. Subsequent laboratory tests confirmed that the substance that ANDERSON sold to UC was fentanyl.

On April 17, 2018, the Federal Bureau of Investigations executed previously authorized search warrant at ANDERSON'S residence in the 4100 block of Camellia. ANDERSON was first observed seated in his blue Mercedes Benz sport-utility vehicle in the alleyway near his residence. ANDERSON and another man exited the vehicle and approached the residence at which the search warrant was to be executed. Law enforcement officers converged on the

residence, causing ANDERSON and others assembled near the residence to flee. ANDERSON disappeared into his residence through the rear door.

The residence was ultimately surrounded and the occupants were ordered to come outside. ANDERSON emerged from the residence as instructed and was taken into custody. During the subsequent search of the residence, investigators discovered a .32 caliber revolver, loaded with three live rounds; an empty 9 mm 50 round drum magazine; several ounces of marijuana; multiple cellular telephones; a digital scale consistent with drug distribution, and a quantity of United States currency which included one or more of the photocopied bills that had been provided to ANDERSON during the April 17, 2018 controlled transaction.

Following his arrest, ANDERSON was transported to the St. Louis County Police Department, where he was advised of his *Miranda* rights. ANDERSON waived his rights and agreed to make a statement. In a recorded, interview, ANDERSON first verified his telephone number – the same telephone number that Hancock had provided to investigators and that UC had called to arrange the drug transactions with ANDERSON. ANDERSON did not deny selling fentanyl. He admitted that he sold "stuff," but claimed that he had "found it." When asked to clarify what "stuff" he meant, ANDERSON stated, "fentanyl." According to ANDERSON, he had "found" the fentanyl after an unknown person in a red vehicle had thrown it out the window while fleeing from police. ANDERSON claimed that he picked up the fentanyl out of the road, split it up, and sold it. When asked where the rest of the fentanyl was, ANDERSON reported that he had sold it all.

ANDERSON advised detectives that he had been giving out "free samples" of the fentanyl as a way to "off-load" it. He initially claimed that he could not "re-up" his fentanyl

supply because he did not have a source of supply. ANDERSON also admitted to having sold heroin and crack cocaine in the past.

Detectives confronted ANDERSON with the fact that they were aware that he had held the same job for several years. They asked him why he sold drugs if he had a job. ANDERSON responded that he sold drugs for extra money, so that he could drive a Mercedes Benz. ANDERSON later admitted to selling heroin, and claimed that the last time he had sold heroin was right before he had "found" the fentanyl.

ANDERSON told detectives that he had been selling heroin to a person named "Brian," who he had met through a man named "Scott." ANDERSON reported that he had met "Scott" at a BP gas station off Natural Bridge. According to ANDERSON, he had sold heroin to "Scott" approximately three times, including one time at a West County apartment. ANDERSON stated that when he sold "Scott" drugs at the apartment, "Scott" was alone. ANDERSON confirmed that he gave "Scott" a sample of fentanyl for free.

Telephone toll records and geolocation information confirm that Hancock and ANDERSON were in communication on April 5, 2018 and that they met in the early morning hours of April 6, 2018 at or near the apartment in which C.P. was found deceased. Similar information obtained for C.P.'s cellular telephone suggests that C.P. did not leave the apartment between the early morning hours of April 6, 2018 and the time he was discovered deceased.

## 5. STATUTORY PENALTIES:

The defendant fully understands that the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than 20 years, a

fine of not more than $1,000,000.00, or both such imprisonment and fine. The Court shall also impose a period of supervised release of not less than three years.

**6. U.S. SENTENCING GUIDELINES: 2018 MANUAL:**

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that he following are the U.S. Sentencing Guidelines Total Offense Level provisions that apply.

**a. Chapter 2 Offense Conduct:**

**(1) Base Offense Level:** The parties agree that the base offense level is 38, as found in Section 2D1.1(a)(2), because the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance. The parties agree that controlled substance distributed by defendant and ingested by C.P. was the "but for" cause of C.P.'s death and, pursuant to Section 1B1.2(c), this Court should apply the base offense level applicable to a distribution resulting in death.

**(2) Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply: None.

**b. Chapter 3 Adjustments:**

**(1) Acceptance of Responsibility:** The parties agree that two levels should be deducted pursuant to Section 3E1.1(a), because the defendant has clearly demonstrated acceptance of responsibility and timely notified the government of the defendant's intention to plead guilty. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the government

10

receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the government may present said evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

**(2) Other Adjustments:** The parties agree that the following additional adjustments apply: None.

**c. Other Adjustment(s) and Disputed Adjustments:** None.

**d. Estimated Total Offense Level:** The parties estimate that the Total Offense Level is 35. **However, the parties agree that the joint recommendation for a sentence of 144 months shall abide, notwithstanding the application or non-application of any sentencing guidelines as contemplated herein. Should the Court decline to accept the parties' plea agreement and sentence defendant to a term of 144 months, either party shall have the right to withdraw from the plea agreement in accordance with Fed. R. Crim. P. 11(c)(1)(C).**

**e. Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**f. Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any

Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

### 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a. Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea, the constitutionality of the statute(s) to which defendant is pleading guilty and whether defendant's conduct falls within the scope of the statute(s).

**(2) Sentencing Issues:** In the event the Court accepts the plea, and sentences defendant to a term of 144 months, both parties mutually agree to waive their rights to appeal all sentencing issues, including any issues relating to the Base Offense Level, the Total Offense Level, and the Criminal History Category.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be

12

sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

## 8. OTHER:

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

**b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:**

Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

**c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished.

**d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which the defendant agrees to pay at the time of sentencing. Money paid by

the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**e. Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f. Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, costs of incarceration and costs of supervision. The defendant agrees that any fine imposed by the Court will be due and payable immediately.

**g. Forfeiture:** The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States. The defendant agrees that said items may be disposed of by law enforcement officials in any manner.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses charged against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the

14

attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the government's evidence and discussed the government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

**10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:**

This document constitutes the entire agreement between the defendant and the government, and no other promises or inducements have been made, directly or indirectly, by any agent of the government, including any Department of Justice attorney, concerning any plea

to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any conditions of release that results in revocation, violates any term of this guilty-plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the government agrees to dismiss or not to bring, or except pursuant to the provisions of Fed. R. Crim. P. 11(c)(1)(C) as described herein.


3/19/21
Date

_for S.W._
SIRENA MILLER WISSLER  #55374MO
Assistant United States Attorney

3-18-2021
Date

WILLIAM PETER ANDERSON
Defendant

3/18/21
Date

MELISSA GOYMERAC
Attorney for Defendant

17